IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

Charles Waldschmidt,

        Plaintiff,


      v.                                    **CLASS ACTION COMPLAINT AND**
                                      **DEMAND FOR A JURY TRIAL**

Union Pacific Railroad Co.,

        Defendant.

---

For his Complaint, Plaintiff Charles Waldschmidt states and alleges as follows:

## **INTRODUCTION**

1.      This case concerns a railroad's hearing-exam and hearing-protection rules that facially discriminate against hearing-impaired employees.

2.      Defendant Union Pacific, like all railroads, has an obligation under federal law to require train conductors, engineers, and other similar railroad employees to undergo periodic hearing exams. It also has an obligation to make hearing protection available to these employees and to require the use of hearing protection in particularly noisy environments, as defined by federal regulations.

3.      Rather than take these requirements at face value, however, Union Pacific has distorted them. At every turn, Union Pacific has adopted overbroad hearing-exam and hearing-protection policies that systematically put hearing-impaired employees at a disadvantage. Some of these policies are openly and unabashedly discriminatory. As a

prime example, Union Pacific requires employees who use hearing aids to pass a hearing exam *without their hearing aids* and *while wearing hearing protection*. But Union Pacific places this burden solely on hearing-impaired workers. Non-hearing-impaired employees are considered fit for duty if they pass the same test *without wearing* hearing protection. Hearing-impaired employees are thus required to pass a much tougher test.

4.     Union Pacific discriminates in other ways as well. It maintains an overbroad hearing-protection policy that, when enforced, systematically disadvantages hearing-impaired employees. And it refuses to provide reasonable accommodations to hearing-impaired employees. Rather than work with hearing-impaired employees to accommodate their disabilities, Union Pacific insists that such employees wear a single, company-approved device that frequently makes their hearing worse. Dooming them to fail, Union Pacific then suspends and terminates employees who cannot meet its discriminatory standards—all while falsely claiming that its own discriminatory policies are mandated by federal law.

5.     This dispute arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, which "was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). As Congress found, "overprotective rules and policies" and "exclusionary qualification standards and criteria," unfairly discriminate against disabled Americans and deprive these individuals of "equality of opportunity, full participation, independent living,

and economic self-sufficiency." 42 U.S.C. § 12101(a)(5), (7). This case concerns precisely such unfair, discriminatory, and overprotective rules and policies.

6.     The ADA broadly prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The phrase "discriminate against a qualified individual on the basis of disability" embraces both plain and technical meanings. At the most basic level, an employer discriminates when it takes an "adverse employment action because of [an employee's] disability." *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 448 (7th Cir. 2001). But the ADA also specifically defines "discriminate against a qualified individual on the basis of disability" to include: "limiting, segregating, or classifying a[n]…employee in a way that adversely affects the opportunities or status of such…employee because of the disability of such…employee"; "utilizing standards…that have the effect of discrimination on the basis of disability"; or "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(1), (3), (6). The ADA further defines discrimination to include "not making reasonable accommodations to the known physical…limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A).

7.     Plaintiff Charles Waldschmidt's experience was emblematic of Union Pacific's discriminatory conduct. Waldschmidt has worked for Union Pacific as a train conductor and brakeman for nearly a decade. He is hearing impaired and wears hearing aids. There is no dispute that he has the requisite skill and experience to perform his job. But Waldschmidt's hearing impairment put him in the crosshairs of Union Pacific's

discriminatory policies. He passed his hearing test while wearing his hearing aids, which is all that is required under the governing federal regulations. But he failed the exam while wearing Union Pacific's required hearing protection device. As a result, Union Pacific refused to allow Waldschmidt to continue working.

8.     Waldschmidt is hardly alone in facing such discriminatory treatment. Proceedings in a parallel case, *see Mlsna v. Union Pacific R.R. Co.*, 975 F.3d 629 (7th Cir. 2020), have revealed that Union Pacific discriminates broadly against its hearing-impaired employees. Its policies are rigid and uniformly applied: *Any* hearing-impaired employee who cannot pass his hearing exam with unaided hearing must pass the test while wearing Union Pacific's pre-selected hearing protection device. *Any* hearing-impaired employee who fails *that* test is not permitted to continue working. By contrast, *any* non-hearing-impaired employee who passes the test with unaided hearing is permitted to continue working. Non-hearing-impaired employees are *not required* to pass a hearing test while wearing hearing protection in order to be considered fit for duty. Union Pacific employs more than 35,000 employees, including thousands of employees with hearing impairments. The scope and breadth of Union Pacific's discriminatory policies are enormous. Waldschmidt therefore brings this case as a class action to remedy these unlawful policies.

9.     On the merits, liability is clear: Union Pacific discriminated against Waldschmidt on the basis of disability when it refused to re-certify him as a conductor and removed him from service on the basis of Waldschmidt supposedly failing Union Pacific's hearing exam. Union Pacific's hearing-exam protocol discriminates against hearing-impaired employees, including Waldschmidt, for a whole host of reasons. The policy

openly disfavors hearing-impaired employees: only employees who wear hearing aids are required to meet the FRA's acuity test while wearing hearing protection. Employees who pass the test without hearing aids are not required to pass it while wearing hearing protection. The policy also "limit[s]" and "classif[ies]" hearing-impaired employees, including Waldschmidt, "in a way that adversely affects the opportunities or status of such…employee because of the disability of such…employee," 42 U.S.C. § 12112(b)(1), "utilize[es] standards…that have the effect of discrimination on the basis of disability," *id.* § 12112(b)(3), and "us[es] qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities," *id.* § 12112(b)(6). For these reasons, Union Pacific has violated the ADA in every instance where it has refused to certify (or decertified) as a conductor or engineer, removed from service, or terminated any employee, including Waldschmidt, who was able to pass the FRA's hearing exam with or without hearing aids.

10.    Union Pacific has also failed to accommodate Waldschmidt's disability as well as the disabilities of similarly situated employees. Both the governing railroad regulations and ADA require railroads to offer employees a wide range of hearing protection devices. Union Pacific has failed to do that, instead adopting a one-size-fits-all approach for all of its hearing-impaired employees. The ADA requires more to accommodate disabled workers.

11.    Plaintiff Waldschimdt brings this case to put a stop to Union Pacific's discriminatory policies.

5

## PARTIES

12.    Plaintiff Charles Waldschimdt is an individual residing in Grand Junction, Colorado.

13.    Defendant Union Pacific is a railroad operating in 23 states across the western two-thirds of the United States. D.E. 3 at 2. It is headquartered in Omaha, Nebraska. Union Pacific employs more than 35,000 people.

## JURISDICTION

14.    This Court has original jurisdiction over Waldschimdt's Americans with Disabilities Act claims under 28 U.S.C. § 1331.

15.    Venue is proper under 28 U.S.C. § 1391 because Waldschimdt resided in the District when he worked for Union Pacific, Union Pacific operates in the District, and the illegal conduct occurred in the District.

## BACKGROUND

**A.    Union Pacific Employed Waldschmidt, a Hearing-Impaired Employee, as a Train Conductor and Brakeman.**

16.    Waldschimdt was employed by Union Pacific as a train conductor and brakeman.

17.    Waldschimdt suffers from moderate hearing loss. He wears hearing aids and his hearing loss is minimal when wearing his hearing aids.

18.    Union Pacific hired Waldschimdt in 2012.

19.    Union Pacific was fully aware of Waldschimdt's hearing impairment when he was hired. There is no indication that Waldschimdt's hearing has materially worsened during his tenure at Union Pacific.

**B.    Union Pacific's Train Crew Job Description.**

20.    Union Pacific's "generic" job description for train crew members explains that the "basic purpose" of the position is to "[e]nsure safe, on-time/on-plan train operation and movement in compliance with company and Federal rules and instructions." *Mlsna v. Union Pacific R.R. Co.*, 3:18-cv-00037, D.E. 51-2 at 1 (W.D. Wis.).[1] The job description lists one-and-a-half pages of "accountabilities," or tasks a train crew member must perform on the job. D.E. 51-2 at 1–2. These tasks include, for example, operating locomotive equipment through the use of remote-control devices, coupling air hoses, uncoupling cars, "preparing written documentation," "working and interacting with others," and "[m]onitoring the situation, environment, and gauges to gather information and take appropriate action." D.E. 51-2 at 1–2. The job description states that "[t]he statements in this section are essential job functions that an employee must be able to perform with or without reasonable accommodation in order to achieve the objectives of the job." D.E. 51-2 at 1–2.

---

[1] Unless otherwise indicated, all references to docket entries refer to the public docket in *Mlsna*.

21.     In a separate section several pages later, the job description states that a train crew member must "wear personal protective equipment such as…hearing protection where the company requires." D.E. 51-2 at 4.

**C.     The FRA Maintains Regulations Governing Occupational Noise Standards and Engineer and Conductor Certification.**

22.     At the direction of Congress, the Federal Railroad Administration ("FRA") comprehensively regulates matters of health and safety in the railroad industry. Two FRA regulations play a starring role in this case. The first establishes occupational noise standards for railroads, including the use of hearing protection. The second requires railroads to certify train engineers and conductors as fit for duty. That certification requirement, in turn, requires engineers and conductors to pass a hearing exam. Because the remaining facts require familiarity with these regulations, they are set forth in some detail here.

**(1)     The FRA's occupational noise standards.**

23.     The FRA has regulated locomotive noise levels since 1980. Occupational Noise Exposure for Railroad Operating Employees, 71 Fed. Reg. 63,066, 63,068 (Oct. 27. 2006).

24.     The FRA's first such regulation provided that "the permissible exposure to a continuous noise in a locomotive cab shall not exceed an eight-hour time-weighted average of 90 dB(A), with a doubling rate of 5 dB(A)." 49 C.F.R. § 229.121(a) (1980). The same regulation provided that "[e]xposure to continuous noise shall not exceed 115dB(A)." *Id.* § 229.121(c) (1980).

8

25.    Some of these terms require further explanation. "dB(A)" means "the sound pressure level in decibels measured on the A-weighted scale." 49 C.F.R. § 227.5. For the sake of simplicity, this complaint will use the term "decibels" to mean "dB(A)." Because the human ear can perceive a tremendous range of sounds, decibels are measured logarithmically; every increase of 10 decibels represents a doubling of volume. *Id.* The concepts of "time-weighted average" (abbreviated as "TWA") and "doubling rate" (called the "exchange rate" under the current regulations) work in tandem: every time the doubling rate amount is added to the baseline decibels average, the allowable time exposure is cut in half. *Id.* To illustrate, under the 1980 regulation, a train conductor could permissibly be exposed to eight hours of sound averaging 90 decibels, four hours of sounds averaging 95 decibels, two hours of sound averaging 100 decibels, and so forth. 49 C.F.R. § 229.121(c) (1980); 49 C.F.R. § 227.5; 49 C.F.R. Pt. 227, App. A.

26.    The FRA revised and expanded its occupational noise standards in 2006, drawing heavily from regulations issued by the Occupational Safety and Health Administration ("OSHA"). 71 Fed. Reg. 63,066, 63,067. Aside from minor subsequent amendments not relevant here, these revised regulations remain in effect today. *Id.* The 2006 regulations contain a set of mutually reinforcing requirements—all aimed at reducing employees' exposure to harmful levels of noise. *Id.* The new regulations set forth "minimum Federal health and safety noise standards for locomotive cab occupants" but do "not restrict a railroad…from adopting and enforcing additional or more stringent requirements." 49 C.F.R. § 227.1(b).

(a)    *Locomotive design and maintenance standards.*

27.    The centerpiece of the revised regulations is a requirement that new locomotives be designed, built, and maintained to meet strict new noise standards. That regulation requires that "all locomotives of each design or model that are manufactured after October 29, 2007, shall average less than or equal to 85 dB(A) …." 49 C.F.R. § 229.121(a)(1). The regulations also prohibit railroads from "mak[ing] any alterations" to locomotives to increase their average sound levels above established benchmarks and require railroads to "maintain all pre-existing locomotives so that they do not reach excessive noise levels." *Id.* § 229.121(a)(2); 71 Fed. Reg. 63,076. As the FRA explained, "since the early 1990s, the industry has taken delivery of thousands of newer locomotives engineered to reduce noise levels." 71 Fed. Reg. 63,072. "The cabs of most of these locomotives provide an environment where, for the great majority of operating circumstances, employees will not experience 8 hour TWA exposures approaching 90 dB(A)…." *Id.*

### (b)    *Operational controls.*

28.    Building on these design and maintenance standards, the revised regulations "encourage[] [railroads] to use noise operational controls" to reduce employees' exposure to excessive noise. 49 C.F.R. § 227.113. "Operational controls refer to efforts to limit workers' noise exposure by modifying workers' schedules or locations or by modifying the operating schedule of noisy machinery." 71 Fed. Reg. 63,101. The FRA lists several non-exhaustive examples of operational controls, including "placement of a newer (i.e., quieter) locomotive in the lead" of a train; "rotation of employees in and out of noisy locomotives"; and "variation of [an] employee's routes." Operational controls are

beneficial, according to the FRA, "because they help reduce the total daily noise exposure of employees" and "take the burden off the employee to protect himself or herself" with hearing protection. *Id.*

### *(c)    Noise-monitoring and hearing-conservation programs.*

29.    The 2006 regulations for the first time required railroads to establish noise-monitoring and hearing-conservation programs. 49 C.F.R. § 227.103.

30.    The regulations governing noise monitoring require railroads to "take noise measurements under typical operating conditions" using a sound level meter or noise dosimeter. *Id.* § 227.103(c); 71 Fed. Reg. 63,088. In making those measurements, the regulations require railroads to "use a sampling strategy that is designed to identify employees for inclusion in the hearing conservation program and to enable the proper selection of hearing protection." 49 C.F.R. § 227.103(b)(1). Where factors such as "high worker mobility, significant variations in sound level, or a significant component of impulse noise make area monitoring generally inappropriate," the regulations generally require railroads to "use representative personal sampling to comply with the monitoring requirements of this section." *Id.* § 227.103(b)(2). "Representative personal sampling means measurement of an employee's noise exposure that is representative of the exposures of other employees who operate similar equipment under similar conditions." *Id.* § 227.5. Although the FRA adopted a representative-sampling standard, the agency made clear that railroads remain "free to employ continuous monitoring," where each discrete workspace is monitored on an ongoing basis. 71 Fed. Reg. 63,087.

31.    The regulations require railroads to administer a hearing-conservation program for all employees exposed to noise at or above "an eight-hour time-weighted-average sound level (TWA) of 85 dB(A)." 49 C.F.R. §§ 227.107, 227.5. Railroads must provide these employees with free "audiometric testing"—hearing exams—at least once every three years. *Id.* § 227.109(b), (f). The results of the first exam serve as a "baseline audiogram"—essentially a snapshot in time of an employee's hearing ability against which future tests can be compared. *Id.* § 227.109(e).

*(d)    Hearing protection.*

32.    Finally, the 2006 regulations established several new requirements governing the use of hearing protectors (or "HP").

33.    The regulations require railroads to "provide hearing protectors to employees" covered by the railroad's hearing-conservation program "at no cost to…employee[s]." *Id.* § 227.115(a)(1) and (b). Railroads must must "provide training in the use and care of all hearing protectors provided to employees," "ensure proper initial fitting," "supervise the correct use of all hearing protectors," and "replace hearing protectors as necessary." *Id.* § 227.115(a)(2), (5)–(6).

34.    The regulations "require the use of hearing protectors" when certain thresholds are met. *Id.* § 227.115(a). Employees who have not yet established a baseline audiogram or whose hearing has significantly worsened must wear hearing protection if they are exposed to sound levels equivalent to an 8-hour Time Weighted Average of 85 dB(A) or greater. *Id.* §§ 227.115(c), 227.5 (defining "Standard threshold shift," the metric for determining an actionable deterioration in hearing acuity). All other employees must

"use…hearing protectors when [they are] exposed to sound levels equivalent to an 8-hour TWA of 90 dB(A) or greater." *Id.* § 227.115(d).

35.    Railroads must "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors" including "devices with a range of attenuation levels." *Id.* § 227.115(a)(4). This provision "underscore[s] the importance of railroads offering employees with sufficient options." 71 Fed. Reg. 63,103. "When offering hearing protectors, employers should offer employees several different types, whether ear plugs, ear muffs, and/or electronic headsets. Within any given type, the employer should offer several different designs and models." *Id.* at 63,104. The regulations require a "range of attenuation levels" because railroads must "evaluate hearing protector attenuation for the specific noise environments in which the protector will be used." 49 C.F.R. § 227.117(a). Hearing protectors need only return the employee to noise exposures below the triggering threshold, "attenuat[ing] employee exposure to an 8-hour TWA of 90 decibels [or 85 decibels in the special cases described in the previous paragraph]." *Id.* § 227.117(b).

36.    The FRA makes railroads responsible for evaluating hearing-protector attenuation—in other words, determining how much sound a given pair of hearing protectors blocks—but gives them a wide range of options to make that determination. *See id.* § 227.117(a); 71 Fed. Reg. 63,072. As a starting point, the FRA defines "hearing protector" broadly, as "any device or material, which is capable of being worn on the head, covering the ear canal or inserted in the ear canal; is designed wholly or in part to reduce the level of sound entering the ear; and has a scientifically accepted indicator of its noise

reduction value." 49 C.F.R. § 227.5. That last clause—"scientifically accepted indicator of its noise reduction value"—is important. During the rulemaking, several stakeholders urged the FRA to mandate the "use [of] a specific indicator, the Noise Reduction Rating ([abbreviated as] NRR)." 71 Fed. Reg. 63,083. The FRA rejected using the Noise Reduction Rating as the sole permissible indicator. *Id.* The FRA expressed concern that limiting the definition to a single standard "would prevent the industry from availing themselves of advances in science and technology." *Id.* The FRA also found it inappropriate to adopt the Noise Reduction Rating standard because "there are several possible indicators that FRA could use and…there is not widespread public support for any particular one." *Id.* The Association of American Railroads—Union Pacific's industry group—also opposed using the Noise Reduction Rating as the solely accepted benchmark:

> The [Association of American Railroads] wrote that railroads should not be limited to the [Noise Reduction Rating] for evaluating [hearing protectors] attenuation, because it does not provide the flexibility to employ current science. The [Association of American Railroads] explained that there is current technology, such as in-the-ear microphones, which measure actual attenuation, and that technology would not be available if railroads were limited only to the [Noise Reduction Rating].

*Id.*

37.     The FRA's regulation on evaluating hearing-protector attenuation is also framed broadly. That regulation "directs that a railroad shall use one of" three evaluation methods: "derating by type, Method B from ANSI [American National Standards Institute] S12.6-1997…, [or] objective measurement." *Id.* at 63,104; 49 C.F.R. § 227.117(a); *id.* Pt. 227, App. B. The FRA had originally proposed adopting the methods used in OSHA's regulations: the Noise Reduction Rating (NRR) and the National Institute for Occupational

14

Safety and Health (NIOSH) methods #1, #2, and #3. 71 Fed. Reg. 63,104. The FRA rejected these metrics and adopted the three it did as better suited to the railroad industry. *Id.* at 63,104–05. Only the first-listed method—derating by type—even mentions the Noise Reduction Rating. 49 C.F.R. Pt. 227, App. B. Of the three available methods, objective measurement—where the evaluator "[u]ses actual measurements of the level of noise exposure…inside the hearing protector when the employee wears the hearing protector in the actual work environment"—is the most accurate. 71 Fed. Reg. 63,105.

38.    The regulations and FRA guidance broadly discourage railroads from mandating the use of hearing protection any more than necessary.

39.    Section 227.103(e) provides that, "in administering the monitoring program, a railroad shall take into consideration the identification of work environments where the use of hearing protectors may be omitted." 49 C.F.R. § 227.103(e). "The purpose of this provision is to ensure that railroads do not excessively rely on reflexive use of hearing protectors when structuring their hearing conservation programs." 71 Fed. Reg. 63,088. Section 227.103(e) requires railroads to use the information gleaned from their noise-monitoring programs to "determine general categories of work assignments that require hearing protectors and those that do not." *Id.* "Examples of situations where hearing protection may be omitted include…'[g]round' assignments where employees…have limited exposure to loud and persistent noise sources such as locomotives" and "[c]abs designed for sound reduction." *Id.* As the FRA recognized in 2006, "over the past decade and a half, the locomotive fleet has come to be dominated by cabs that are sufficiently

15

quieter such that hearing protection is not required under most conditions of operation." *Id.* at 63,076.

40.     The FRA has repeatedly emphasized that "several benefits…accrue when employees refrain from over-using hearing protectors." *Id.* Working without hearing protection "maximiz[es] the availability of auditory cues…which results in improved personal safety." *Id.* In addition, "[o]verprotection can erode compliance." *Id.* When employees are "instructed to wear HP at all times and in all circumstances, it creates the impression for the employee that the HP requirement is just a pro forma requirement, not part of a larger program designed to protect their hearing. With that mindset, the employee is less likely to wear HP." *Id.*

41.     Other regulatory provisions reinforce these same goals. Section 227.115(a)(4) requires railroads to "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors" including "devices with a range of attenuation levels." 49 C.F.R. § 227.115(a)(4). Section 227.115(a)(3) provides that "[w]hen offering hearing protectors, a railroad shall consider an employee's ability to understand and respond to voice radio communications and audible warnings." *Id.* § 227.115(a)(3). These requirements address the "FRA's concern that the overuse of hearing protection may be counter-productive, especially for employees with existing hearing loss." 71 Fed. Reg. 63,102. "In addition to offering devices with high attenuation, railroads should offer devices with low or moderate attenuation." *Id.* at 63,104. "[A]n employer should provide HP types with ranges that are sufficient to protect the employee from the level of noise expected but still permit the employee to communicate effectively for the

job." *Id.* For example, an employee "who is exposed to a TWA of 85 or 86 dB(A),"—the minimum possible threshold for required hearing protection—"should not wear HP that provides 30 dB in noise reduction, because that will reduce the employee's hearing ability and thus the employee's ability to listen and communicate in the cab." *Id.* at 63,102.

**(2)     The FRA's engineer- and conductor-certification rules.**

42.     Congress has also mandated rules for certifying locomotive engineers and conductors.[2]

43.     The FRA first adopted rules for certifying engineers in 1991. Qualifications for Locomotive Engineers, 56 Fed. Reg. 28228-01 (June 19, 1991). The goal of the certification rule was to set out minimum qualification standards for locomotive engineers. *Id.*

44.     Relevant here, in order to be certified as an engineer, a person:

> shall have hearing acuity that meets or exceeds the following thresholds when tested by use of an audiometric device (calibrated to American National Standard Specification for Audiometers, S3.6-1969): the person does not have an average hearing loss in the better ear greater than 40 decibels at 500Hz, 1,000 Hz, and 2,000 Hz with or without use of a hearing aid.

49 C.F.R. § 240.121(d). A person who fails this hearing test may still be certified as a conductor, however, with or without "special restrictions," "[i]f, after consultation with one of the railroad's designated supervisors of locomotive engineers, the medical examiner

---

[2] Conductors and locomotive engineers are separate and distinct jobs in the railroad industry. A conductor is defined as a "crewmember in charge of a 'train or yard crew.'" 49 C.F.R. § 242.7. A locomotive engineer is generally defined as a "person who moves a locomotive." 49 C.F.R. § 240.7.

concludes that… the person has the ability to safely operate a locomotive." *Id.* §
240.121(e).

45.    At Congress' direction, the FRA issued new regulations, effective in 2012,
requiring railroads to implement a program for certifying conductors. Conductor
Certification, 76 Fed. Reg. 69,802 (Nov. 9, 2011).

46.    The new rule "prescribes minimum Federal safety standards for the
eligibility, training, testing, certification and monitoring of all [covered] conductors." 49
C.F.R. § 242.1(b). Its purpose is "to ensure that only those persons who meet minimum
Federal safety standards serve as conductors." *Id.* § 242.1(a).

47.    The conductor-certification rule was modeled after the engineer-certification
rule adopted by the FRA in 1991. 76 Fed. Reg. 69,802; 56 Fed. Reg. 28228-01.

48.    Most relevant here, the new conductor regulations require that a person pass
a hearing exam to be certified as a conductor. The rule governing hearing exams provides
that:

> [E]ach person shall have a hearing test or audiogram that shows the person's
> hearing acuity meets or exceeds the following thresholds: The person does
> not have an average hearing loss in the better ear greater than 40 decibels
> *with or without the use of a hearing aid*, at 500 Hz, 1,000 Hz, and 2,000 Hz.

*Id.* § 242.117(i) (emphasis added). A person who fails this hearing test may still be certified
as a conductor, however, with or without "special restrictions," "[i]f, after consultation with
a railroad officer, the medical examiner concludes that…the person has the ability to safely
perform as a conductor." *Id.* § 242.117(j); *see also id.* § 242.117(c)(2).

49.    The standards governing hearing acuity for locomotive engineers and conductors are the same. And nothing in the engineer-certification or conductor-certification regulations or the FRA's implementing guidance suggests that conductors who may be required to wear hearing protection must meet the hearing-acuity thresholds set forth in Sections 240.121(d) or 242.117(i) *while wearing hearing protection*. *See generally* 49 C.F.R. Pt. 240; Pt. 242; 56 Fed. Reg. 28228, 28,228-28,276; 76 Fed. Reg. 69,802, 69,802–66. The hearing-acuity regulations simply require meeting the stated thresholds "with or without the use of a hearing aid." 49 C.F.R. § 240.121(d); 49 C.F.R. § 242.117(i).

50.    The FRA's engineer-certification and conductor-certification regulations require railroads to put any adverse certification decisions in writing and set forth "the basis for [the] denial decision." *Id.* § 240.219(c); *id.* § 242.401(c). The aggrieved employee "may petition the [FRA] to review the railroad's decision." *Id.* § 240.401(a); *id.* § 242.501(a). The FRA then "determine[s] whether the denial or revocation of certification or recertification was improper under this regulation…and grant[s] or den[ies] the petition accordingly." *Id.* § 240.405(f); *id.* § 242.505(k).

**D.    Union Pacific Adopts a Hearing Protection Policy that Is More Stringent than Required by the FRA Regulations.**

51.    Union Pacific has adopted a hearing-protection policy that is far more stringent than—and in some cases directly contradicts—the FRA's standards.

52.    Despite the FRA's admonition that railroads should not "excessively rely on reflexive use of hearing protectors when structuring their hearing conservation programs,"

71 Fed. Reg. 63,088, Union Pacific formally requires all conductors to wear hearing protection. D.E. 51-5 at 3; 51-9 at 3. Union Pacific also requires all employees, including conductors, "to wear approved hearing protection in identified hearing protection areas" demarcated by signs and whenever they are within 150 feet of a locomotive, unless they are inside the cab with the doors and windows closed. D.E. 51-6 at 1, 3, 6.

53.    In support of its more-stringent policy, Union Pacific claims it engaged in "representative sampling designed to measure a conductor's noise exposure" as "required by the FRA," and learned that 13 percent (22 of 172) of "thru-freight" conductors  and 7 percent (6 of 91) of "local" conductors were exposed to an 8-hour Time Weighted Average of over 90 decibels. D.E. 51 at 7. Based on this data, Union Pacific claims that, even now, conductors are "certain to encounter" excessive noise.

54.    Union Pacific's claim is baseless, and its use of statistical evidence is highly misleading. The noise-sampling evidence gathered by Union Pacific consists of records of average noise exposure from five different railroads during a period spanning from 1980 to 2017. D.E. 53-5 at 1; 53-6 at 1 (the "Lavg" column contains the relevant Time Weighted Average figures). The inclusion of old data is particularly problematic because, as previously discussed, the FRA mandated the use of quieter locomotives beginning in 2007 and railroads voluntarily began "tak[ing] delivery of thousands of newer locomotives engineered to reduce noise levels" in the 1990s. 49 C.F.R. § 229.121(a)(1); 71 Fed. Reg. 63,072. For example, Union Pacific highlighted the fact that one conductor in the sample was exposed to an 8-hour Time Weighted Average of 97 decibels—the highest measured noise dose in the sample. D.E. 51 at 7. But this measurement was taken in 1991. D.E. 53-

5 at 1. Conversely, inclusion of data from other railroads is hardly relevant and contravenes the FRA's requirement that railroads do their own sampling. 49 C.F.R. § 227.103(b)(2).

55.    The *relevant* data collected by Union Pacific tells a dramatically different story. Looking exclusively at measurements taken on or after February 26, 2007 (the date the FRA regulations mandating sampling took effect) by Union Pacific (not other railroads), zero percent (0 of 64) of "thru-freight" conductors were exposed to an 8-hour Time Weighted Average of 90 decibels or greater. D.E. 53-5 at 1. In fact, all but one of the measurements exceeding the 90-decibel threshold were taken in the 1980s and 90s. D.E. 53-5 at 1. Even examining all of the thru-freight conductor data (for all railroads) shows that out of 172 readings, 22 recorded an 8-hour TWA of 90 or greater. Twenty-one of these samples were taken between 1988 and 1992. The single most recent measurement meeting or exceeding the 90-decibel threshold was taken in 2001. D.E. 53-5 at 1. Conversely, only 3.5 percent (2 of 56) of local conductors employed by Union Pacific were exposed to an 8-hour Time Weighted Average of 90 decibels or greater. D.E. 53-6 at 1. And those two measurements revealed noise levels at 91 decibels—just above the 90 decibel threshold—over a very short period of time. Even these measurements are no evidence of excessive noise. Under the governing regulations, an average sound level of 91 decibels is permitted for a full seven hours. See 49 C.F.R. 227 Appendix A, Table A-2.

56.    The complete absence of evidence supporting Union Pacific's claim that its employees are currently exposed to noise exceeding the legal threshold aligns perfectly with the FRA's observation in 2006 that "the locomotive fleet has come to be dominated by cabs that are sufficiently quieter such that hearing protection is not required under most

conditions of operation." 71 Fed. Reg. 63,076. As the Seventh Circuit bluntly observed, the decades-old data showing exposures to excessive noise is "not relevant." *Mlsna v. Union Pacific R.R. Co.*, 975 F.3d 629, 635 (7th Cir. 2020). On the contrary, "[t]he data show no dangerous noise levels to which [conductors were] exposed" during the relevant timeframe. *Id.*

57.    Despite Union Pacific's formal policy broadly requiring hearing protection, the practice among employees on the ground is another matter. Union Pacific's hearing protection rules are not stringently enforced.

**E.    Union Pacific Adopts a Hearing-Testing Policy that Is Inconsistent with the FRA Regulations.**

58.    Union Pacific has also adopted an overbroad and, at times, outright discriminatory hearing-exam policy.

59.    Despite the fact that the FRA's hearing-acuity requirements only apply to locomotive engineers and conductors, Union Pacific applies the hearing-acuity rules more broadly to all train and engine employees, including brakemen, switchmen, firemen, and other similar railroad employees. In other words, Union Pacific will disqualify *any employee* who has "an average hearing loss in the better ear greater than 40 decibels." 49 C.F.R. § 240.121(d); *id.* § 242.117(i).

60.    In the main, however, Union Pacific applies the FRA's acuity standards in a highly distorted and discriminatory manner.

61.    Union Pacific requires all train employees (including those with hearing impairments) to take a hearing test *without hearing aids*. D.E. 58-2 at 3. If the test subject

satisfies the FRA's threshold—that is, "[t]he person does not have an average hearing loss in the better ear greater than 40 decibels…at 500 Hz, 1,000 Hz, and 2,000 Hz"—he passes. *Id.* No further testing is required. *Id.*

62.     Union Pacific enforces a different requirement on hearing-impaired employees. Per Union Pacific's policy, a conductor who satisfies the FRA's hearing-acuity threshold while wearing hearing aids does not pass the exam and cannot be certified as a conductor or an engineer. D.E. 51-5 at 4; 58-2 at 3. In order to pass, Union Pacific requires hearing-impaired employees to satisfy the FRA's hearing-acuity threshold while wearing hearing protection and without hearing aids. D.E. 51-5 at 4; 58-2 at 3. Union Pacific mandates the use of a single-hearing protection device for all hearing-impaired conductors: the "Pro Ears – Gold" device. D.E. 51-5 at 4. The Pro Ears – Gold device is an Amplified Hearing Protection Device (or "AHPD"), an electronic ear-muff style hearing protector with an external microphone and internal speaker designed to "amplif[y] ambient sound but block[] noise over 85 decibels." D.E. 53-1 at 3. The device is marketed to hunters and "makes no mention of its appropriateness for use by individuals with [a] hearing impairment." D.E. 48 at 4. Union Pacific's policies prohibit wearing hearing aids underneath either amplified hearing-protection devices or standard earmuff-style hearing protectors. D.E. 51-5 at 5. Thus, under Union Pacific's policies, a hearing-impaired employee is deemed to have passed his hearing exam, and is therefore eligible for certification as a conductor, *only* if he satisfies the FRA's hearing-acuity threshold while wearing the Pro Ears – Gold device. D.E. 53-1 at 4; 58-2 at 3. Cumulatively, these policies

produce a startling result: Union Pacific flatly prohibits hearing-impaired employees from wearing hearing aids on the job.

63.    Union Pacific's hearing-exam policy for hearing-impaired employees contravenes the FRA regulations in several important respects. It wrongly assumes that hearing-impaired employees cannot pass the FRA-mandated hearing exam while wearing hearing aids but not hearing protection. *See* 49 C.F.R. § 242.117(i). It prohibits hearing-impaired employees from wearing hearing protectors over hearing aids, which the regulations permit. *Id.* § 227.115(a)(4). Union Pacific's requirement that all hearing-impaired employees use a single pre-approved device runs afoul of its obligation to "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors." *Id.* Indeed, railroads should "offer employees several different types, whether ear plugs, ear muffs, and/or electronic headsets. Within any given type, the employer should offer several different designs and models." 71 Fed. Reg. 63,104 (emphasis added). Union Pacific's policy also fails to provide hearing-impaired employees with a "range of attenuation levels" to best accommodate "the specific noise environments in which the protector will be used." 49 C.F.R. § 227.117(a). Union Pacific's Pro Ears – Gold device has an attenuation rating of 30 decibels—on the very high end of the attenuation scale. D.E. 51-5 at 4. But as the FRA has cautioned, attenuation overkill is bad: an employee whose work environment is right at the threshold for requiring hearing protection should not wear high-attenuation hearing protectors. 71 Fed. Reg. 63,102; 49 C.F.R. § 227.117(a).

64.     Union Pacific's testing regime also flatly discriminates against hearing-impaired employees. Only hearing-impaired employees are required to meet the FRA's hearing-acuity threshold *while wearing hearing protection*. D.E. 58-2 at 3. An employee who passes the exam without hearing aids—even barely passes—is not then required to meet the FRA's hearing-acuity threshold while wearing hearing protection. D.E. 58-2 at 3. Under Union Pacific's policies, only hearing-impaired employees must do so. D.E. 58-2 at 3. Union Pacific's testing policy is not a neutral, uniform protocol that disparately impacts hearing-impaired employees (although such a policy would still be problematic); Union Pacific's testing policy *facially discriminates* against hearing-impaired employees.

65.     Indeed, Union Pacific's policy actually ensures that some employees who *pass* Union Pacific's test will have *greater hearing loss* on the job compared to the disabled employees who fail. Consider two hypothetical employees to drive the point home. Smith wears hearing aids. With his hearing aids in, he has no hearing loss. Without hearing aids, his "average hearing loss in the better ear" is 41 decibels—just shy of meeting the FRA acuity threshold. While wearing standard earmuffs and hearing aids, Smith's average hearing loss in the better ear is 30 decibels.  While wearing Union Pacific's approved Pro Ears Gold device, his average hearing loss in the better ear is 56 decibels. Union Pacific will not certify Smith. Now consider Jones. Jones does not wear hearing aids, but he does have some mild hearing loss: his "average hearing loss in the better ear" is 39 decibels—just good enough to meet the FRA acuity threshold. When Jones wears the same standard earmuffs as Smith, however, his hearing is attenuated an additional 30 decibels: his "average hearing loss in the better ear" is now *69 decibels*. Union Pacific will certify

25

Jones—the employee whose hearing loss while wearing hearing protection is far worse than Smith's.

66.    This is wildly discriminatory. If Union Pacific in fact believed it was essential for employees to meet the FRA standards while wearing hearing protection, Union Pacific would require *all employees* to undergo auditory testing with hearing protection to ensure that they can do so. But it does not. Instead, Union Pacific assumes that nondisabled employees are good enough while setting up disabled employees to fail by forcing them to undergo testing with a device that often *makes their hearing worse*.

## F.    Waldschmidt Undergoes Testing Under Union Pacific's Hearing-Testing Policy.

67.    April 23, 2018, Waldschmidt sat for his required hearing exam.

68.    Waldschmidt was first tested without his hearing aids and without hearing protection. As expected, Waldschmidt did not meet the FRA's hearing-acuity threshold. The test showed that Waldschmidt had an average hearing loss of 53.3 decibels. That result, however, revealed no material deterioration in Waldschmidt's hearing ability when compared to his prior exam results. The FRA's hearing-protection regulations attach significance to this fact. Recall that employees whose hearing has significantly worsened (as defined in the regulations) must wear hearing protection if they are exposed to sound levels equivalent to an 8-hour Time Weighted Average of 85 dB(A) or greater. *Id.* §§ 227.115(c), 227.5. All other employees must "use…hearing protectors when [they are] exposed to sound levels equivalent to an 8-hour TWA of 90 dB(A) or greater." *Id.* § 227.115(d). Waldschmidt's test results placed him firmly in the second category.

26

69.    Waldschmidt was tested again on June 15, 2018. Without his hearing aids, Waldschmidt scored similarly: he had an average hearing loss in his better ear of 48.3 decibels. Waldschmidt was then tested with his hearing aids but without hearing protection. Under that scenario, Waldschmidt passed the test with an average loss of 26.6 decibels, easily meeting the FRA's hearing-acuity threshold.

70.    Waldschmidt was then tested under two additional scenarios: (1) without hearing aids but wearing an amplified hearing-protection device (a set of Howard Leight AHPDs) with the volume turned off, and (2) without hearing aids but wearing the same amplified hearing-protection device with the volume turned all the way up. Waldschmidt failed to meet the FRA's hearing-acuity threshold under either scenario. With the device turned on, his hearing loss was 51.6 decibels—about the same as his unaided hearing.

71.    Immediately after these tests, Union Pacific removed Waldschmidt from service and "initiated a fitness-for-duty determination."

72.    Waldschmidt visited an audiologist on July 2, 2018. The audiologist tested Waldschmidt under the same four scenarios as the prior test: (1) without his hearing aids and without hearing protection, (2) with his hearing aids but without hearing protection, (3) without hearing aids and wearing an amplified hearing-protection device with the volume turned off, and (4) without hearing aids and wearing the amplified hearing-protection device with the volume turned all the way up. The only difference: in this round of testing, Waldschmidt wore the Pro Ears – Gold device as the amplified hearing-protection device.

73.     Waldschmidt's results were the same. He met the FRA's hearing-acuity threshold while wearing his hearing aids but failed to meet the FRA's hearing-acuity threshold under the other three testing scenarios. While wearing the Pro Ears – Gold device with the device turned on, Waldschmidt had an average hearing loss of 48.3 decibels.

74.     Based on these test results, Union Pacific concluded that Waldschmidt could not be certified as a conductor. He was prohibited from working for Union Pacific for over a year. In April 2019, Waldschmidt was able to meet—barely—the FRA's acuity threshold while wearing he Pro Ears Gold device. As indicated above, Waldschmidt's hearing puts him very close to the 40 decibel threshold, and on this occasion, he was able to pass. Union Pacific accordingly allowed him to resume his duties. But in 2020, Waldschmidt once again failed to meet the FRA's acuity threshold while wearing the Pro Ears device. And once again, he was removed from duty. He remains off the job to this day.

**G.     Waldschmidt Performed the Essential Functions of His Job.**

75.     Waldschmidt has always been able to perform the essential functions of his job as a conductor and brakeman. His disability has not impaired his ability to do his job and he has excelled at his work.

76.     Wearing hearing protection in every circumstance covered by Union Pacific's policies is a non-essential function. Wearing hearing protection is an essential function only when required by the FRA's regulations. And there is no evidentiary basis to conclude that the FRA regulations required Waldschmidt to use hearing protection.

77.     A number of factors support the conclusion that Union Pacific's more stringent hearing-protection standards are non-essential functions. A train employee's

28

position would not be fundamentally altered if hearing protection were required by Union Pacific only when mandated by the FRA regulations. Indeed, a reasonable observer watching a conductor or engineer do his job would likely perceive no difference.

78.    Union Pacific's job description supports the same conclusion. The job description lists one-and-a-half pages of tasks that are explicitly labeled as "essential job functions." D.E. 51-2 at 1–2. The job description's requirement that conductors "wear personal protective equipment such as…hearing protection where the company requires" appears several pages later and without any such label. D.E. 51-2 at 4.

79.    Evidence of the employer's actual practices in the workplace further supports the same point. Although Waldschmidt wore hearing protection from time to time, Union Pacific's broad policies were never enforced as written.

80.    The FRA's regulations themselves amount to powerful evidence that they represent the essential requirements of wearing hearing protection. The agency's expertise in railroad safety and careful science-based approach in rulemaking illustrate that employees may safely perform their jobs without hearing protection when not required. This regulatory judgment strongly suggests that any additional requirements imposed by railroads are non-essential functions under the ADA.

81.    Because the FRA's hearing-protection standards—and not Union Pacific's more stringent policies—capture the essential functions of the job, it follows that wearing hearing protection was not an essential function of Waldschmidt's job because there is no evidence that he was exposed to levels of noise sufficient to trigger the FRA's hearing-protection requirement.

29

82.     Waldschmidt's argument is grounded in the FRA standards, which require hearing protection only "when an employee is exposed to sound levels equivalent to an 8-hour TWA of 90db(A) or greater." 49 C.F.R. § 227.115(d). There is no evidence that Waldschmidt or other similarly situated employees were ever exposed to such sound levels. While the FRA regulations mandate sampling, railroads remain "free to employ continuous monitoring," where each discrete workspace is monitored on an ongoing basis. 71 Fed. Reg. 63,087. There is no evidence that Union Pacific has ever done this.

83.     The linchpin of Union Pacific's argument is the sampling data that it claims shows that conductors and similarly situated employees are sometimes exposed to noise levels meeting or exceeding an 8-hour Time Weighted Average of 90db(A). But Union Pacific's own evidence utterly fails to substantiate its claim. Samples of Union Pacific thru-freight conductors taken between 2007 and 2017 show that zero percent (0 of 64) of thru-freight conductors were exposed to an 8-hour Time Weighted Average of 90 decibels or greater. D.E. 53-5 at 1. The single most recent measurement meeting or exceeding the 90-decibel threshold was taken in 2001—the rest were taken in the 1980s and 90s. D.E. 53-5 at 1. The same is true for local conductors, who Union Pacific's own data confirm were not exposed to excessive noise. The stark differences between the older and newer samples make perfect sense in light of the FRA's mandated use of quieter locomotives beginning in 2007 and railroads' voluntary purchase "of thousands of newer locomotives engineered to reduce noise levels" starting in the 1990s. 49 C.F.R. § 229.121(a)(1); 71 Fed. Reg. 63,072.

30

84.    There is a complete absence of evidence supporting the claim that Waldschmidt was exposed to noise levels meeting or exceeding an 8-hour TWA of 90db(A).

85.    Similarly, it is not an essential function of train employees' positions to pass the FRA's hearing acuity test *while wearing* hearing protection.

86.    Union Pacific has "consistently articulated that it [cannot] certify [conductors when they do] not meet FRA minimum standards when wearing mandatory, approved hearing protection." D.E. 51 at 36. But Union Pacific's position rests upon a gross misinterpretation of the governing regulations.

87.    Most obviously, the plain text of the governing regulation makes no mention of wearing hearing protection. The hearing test must show, without qualification, that "[t]he person does not have an average hearing loss in the better ear greater than 40 decibels *with or without the use of a hearing aid*, at 500 Hz, 1,000 Hz, and 2,000 Hz." 49 C.F.R. § 242.117(i) (emphasis added); *id.* § 240.121(d). Had the FRA wished to require testing with hearing protectors, it certainly would have said so directly. *See Mlsna*, 975 F.3d at 636 ("If the hearing acuity regulation was meant to require hearing protection, it could have said so, but it does not.").

88.    Other indicia of the FRA's intent support the same result. The FRA's conductor-certification regulation was adopted in 2011—five years after the FRA issued its comprehensive occupational-noise standards for railroads, including the use of hearing protection. The FRA knew in 2011 that some railroad employees may be required to wear

hearing protection. Yet it adopted a hearing-test regime that makes no mention of hearing protection. *See generally* 49 C.F.R. Pt. 242; 76 Fed. Reg. 69,802, 69,802–66.

89.     Union Pacific's contrary claim is principally based on a practical argument: if an employee is required to both pass a hearing exam and wear hearing protection (which Waldschmidt disputes, but here is assumed), then of course he must pass the hearing exam while wearing hearing protection. If he can't meet the acuity thresholds under all possible circumstances then he can't hear well enough to do the job. But this argument contains a flawed premise: the assumption that the FRA's hearing-acuity standards represent the actual physical minimum requirement for hearing under any circumstances in the conductor position. The opposite premise is stronger: that the FRA's hearing-acuity threshold represents an ability level that would permit someone to work as a conductor under a variety of circumstances—including with or without hearing protection.

90.     Under the FRA regulations, the potential use of hearing protection is fully baked into the FRA's hearing-acuity testing standard. The FRA standard requires hearing loss of no greater than 40 decibels in the better ear. 49 C.F.R. § 242.117(i); *id.* § 240.121(d). A hearing loss of 40 decibels is considered "mild." *See* JG Clark, Uses and Abuses of Hearing Loss Classification, 493–500 (1981). As hearing deteriorates further, it is classified progressively as "moderate," "moderate severe," "severe," and "profound." *Id.* It is not unreasonable to assume that someone with normal hearing or mild hearing loss could safely attenuate his hearing a little further with hearing protectors and still safely perform as a conductor.

91.     The FRA fully agrees with Waldschmidt's interpretation of the hearing-acuity regulation. Waldschmidt did not challenge Union Pacific's refusal to recertify him as a conductor before the FRA. But Mark Mlsna—the plaintiff in the *Mlsna* case—did. Mlsna's appeal was successful. The FRA reversed Union Pacific's decision to revoke Mlsna's conductor certification. D.E. 106. The FRA's opinion was unsparing and blunt, explaining that Union Pacific's claim that hearing-impaired employees must meet the FRA's acuity thresholds *while wearing hearing protection* was based on "flagrant misrepresentations" of the FRA's hearing-test requirements. D.E. 106 at 4. The regulations, the FRA held, "permit[] the hearing standard set forth in 49 C.F.R. § 242.117(i) to be met 'with or without use of a hearing aid.'" *Id.* Nothing more is required. *Id.*

92.     But even if Union Pacific's creative interpretation of the hearing-protection and hearing-acuity regulations were correct, it would still face a big problem. Union Pacific's hearing-exam protocol is discriminatory. Union Pacific's claimed requirement that hearing-impaired employees must meet the FRA's hearing-acuity standards while wearing hearing protection cannot be an essential function because Union Pacific does not impose the same requirement on non-hearing-impaired employees. D.E. 58-2 at 3. Union Pacific cannot credibly claim that a requirement it does not impose on the vast majority of its workforce is in fact essential.

93.     Waldschmidt was qualified to continue working as a train conductor and brakeman. He passed his hearing exam. He can do the job without wearing hearing protection. He can do the job while wearing hearing protectors. And he can do the job wearing any number of AHPDs that are on the market. Any of these modest

accommodations is reasonable; and none would remove any essential functions from his role.

**G.    Waldschmidt Asks for a Reasonable Accommodation.**

94.    After he was removed from service, Waldschmidt asked for reasonable accommodations. During his entire tenure at Union Pacific, Waldschmidt had used a hearing protection device manufactured by Howard Leight. He explained that he could simply continue using that device.

95.    Union Pacific was unmoved. As discussed above, Union Pacific requires all hearing-impaired employees to use a single device—the Pro Ears Gold—that was selected by Union Pacific. Waldschmidt explained that this was crazy: no employer in its right mind would require all vision-impaired employees to use the same model of glasses. But Union Pacific did not relent.

96.    Union Pacific's insistence that all hearing-impaired employees use a single company-approved device is based on a cascading series of arbitrary and illegal company policies. First, as already discussed, Union Pacific required all hearing-impaired employees to be able to meet the FRA's acuity thresholds while wearing the device. This policy ruled out a wide range of other devices. Second, Union Pacific prohibited the use of any device Where the manufacturer did not publish a noise reduction rating (or "NRR"). D.E. 60 at 3–4; 64 at 20. The is excuse was equally unfounded. The governing FRA regulations do not require a noise reduction rating as a prerequisite to evaluating and using hearing protectors—they explicitly rejected calls to require it. In fact, Union Pacific's own lobbying group, the Association of American Railroads, successfully lobbied against

requiring the use of the NRR to evaluate hearing protection. Third, Union Pacific prohibits custom earplugs because it claims that "the quality of the custom mold can be highly variable," and that "without a noise reduction rating Union Pacific cannot determine the level of protection, which it considers a safety hazard for employees." D.E. 60 at 3–4. This is false as well: custom in-ear earplugs are actually more reliable on average than over-the-ear devices.

97.    Without these arbitrary restrictions, there are in fact many kinds of hearing protectors available on the market that allow hearing-impaired employees to safely perform their jobs.

98.    No one at Union Pacific took any additional steps to explore possible reasonable accommodations for Waldschmidt. He described the process as akin to talking to a brick wall.

## H.    Waldschmidt's Termination Was Part of a Broad Pattern of Discrimination by Union Pacific Against Disabled Employees.

99.    Union Pacific's discriminatory policies and refusal to accommodate employees in good faith are part of a larger campaign to rid itself of employees with disabilities.

100.    Union Pacific's workforce is unionized, meaning it cannot reduce its workforce without furloughing its newest workers, many of whom Union Pacific's managers know will then seek employment elsewhere. By getting rid of its employees with disabilities, Union Pacific is able reduce its workforce without furloughing its newest— and often lowest-paid—employees.

35

101.    Employees with disabilities—like Waldschmidt —are likely to have higher associated medical costs. Union Pacific is self-insured. By eliminating employees with disabilities, Union Pacific reduces the amount it must pay for employees' medical expenses.

**I.    Waldschmidt Exhausted His Administrative Remedies.**

102.    In October of 2019, Waldschmidt filed a charge with the Equal Employment Opportunity Commission.

103.    Waldschmidt received his "Right to Sue" letter from the Equal Employment Opportunity Commission, which was issued on September 29, 2020.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff Waldschmidt brings ADA claims pursuant to Federal Rule of Civil Procedure 23, seeking back pay, monetary relief, other compensatory relief, and injunctive and declaratory relief on behalf of themselves and the following class:

> Individuals who took and passed the FRA's hearing acuity test with or without hearing aids and who nevertheless were the subjects of one or more adverse actions by Union Pacific because of their hearing acuity test results at any point between 300 days before the earliest date that a named Plaintiff in *Harris v. Union Pacific*, 8:16-cv-00381 (D. Neb.) filed an administrative charge of discrimination to the resolution of this action.

105.    Class treatment is appropriate because the class is so numerous that joinder of all members is impracticable. The exact number within the class is unknown but may be determined from records maintained by Union Pacific.

106.    Class treatment is appropriate because there are questions of law or fact common to the class, including but not limited to:

36

a.      Whether Union Pacific discriminated against Class Members on the basis of their disabilities;

b.      Whether Union Pacific has a uniform policy of requiring hearing-impaired employees to pass the FRA's hearing acuity test while wearing hearing protection, and whether that policy discriminates against hearing-impaired employees;

c.      Whether wearing hearing protection is an essential function of the job;

d.      Whether Union Pacific's policy of requiring hearing-impaired employees to pass the FRA's hearing acuity test while wearing hearing protection is an essential function of the job;

e.      Whether Union Pacific's policy of requiring that all hearing-impaired employees use a single company-approved device amounts to discrimination on the basis of disability;

f.      Whether Union Pacific's hearing-protection and hearing-exam policies have the effect of "limiting, segregating, or classifying a[n]…employee in a way that adversely affects the opportunities or status of such…employee because of the disability of such…employee"; "utilizing standards…that have the effect of discrimination on the basis of disability"; or "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(1), (3), (6);

      g.     Whether Union Pacific failed to accommodate employees' disabilities by enforcing its hearing-protection and hearing-testing rules;

      h.     Whether monetary damages, injunctive relief, and other equitable remedies for the class are warranted; and

      i.     Whether punitive damages are warranted.

107.    Union Pacific is expected to raise additional common defenses to the claims.

108.    Class treatment is appropriate because the named Plaintiff's claims are typical of the claims of the class, and the named Plaintiff will fairly and adequately protect the interests of the class.

109.    The named Plaintiffs have retained competent counsel who are experienced in litigating class actions and will effectively represent the interests of the class.

110.    Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Union Pacific, and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

111.    Class treatment is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Union Pacific has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

112.    Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

113.    Finally, Class treatment is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

## CAUSES OF ACTION

### COUNT I:
### VIOLATIONS OF 42 U.S.C. § 12101, *et seq.*

114.    The ADA "was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). As Congress found, "overprotective rules and policies" and "exclusionary qualification standards and criteria," unfairly discriminate against disabled Americans and deprive these individuals of "equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(5), (7).

115.    The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a). A "qualified individual"

is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8).

116.    The phrase "discriminate against a qualified individual on the basis of disability" embraces both plain and technical meanings. At the most basic level, an employer discriminates when it takes an "adverse employment action because of [an employee's] disability." *Furnish*, 270 F.3d at 448. But the ADA also specifically defines "discriminate against a qualified individual on the basis of disability" to include: "limiting, segregating, or classifying a[n]…employee in a way that adversely affects the opportunities or status of such…employee because of the disability of such…employee"; "utilizing standards…that have the effect of discrimination on the basis of disability"; or "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(1), (3), (6). The ADA also defines discrimination to include "not making reasonable accommodations to the known physical…limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A). When an employee asks for an accommodation because of a disability, the employer "must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Kauffman v. Peterson Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014). Though not an independent cause of action, an employer's failure to engage in the interactive process is actionable when it prevents the identification of an appropriate accommodation for a qualified individual. *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1059 n.1 (7th Cir. 2014).

117.    Union Pacific was Waldschmidt's employer within the ADA's meaning.

118.    Waldschmidt is disabled within the ADA's meaning.

119.    Waldschmidt is a qualified individual within the ADA's meaning.

120.    Union Pacific discriminated against Waldschmidt on the basis of disability when it refused to certify him as a conductor, removed him from service, and prohibited him from working on the basis of Waldschmidt supposedly failing Union Pacific's hearing exam. Union Pacific's hearing-exam protocol discriminates against hearing-impaired employees, including Waldschmidt, for a whole host of reasons. The policy openly disfavors hearing-impaired employees: only employees who wear hearing aids are required to meet the FRA's acuity test while wearing hearing protection. Employees who pass the test without hearing aids are not required to pass it while wearing hearing protection. The policy also "limit[s]" and "classif[ies]" hearing-impaired employees, including Waldschmidt, "in a way that adversely affects the opportunities or status of such…employee because of the disability of such…employee," 42 U.S.C. § 12112(b)(1), "utilize[es] standards…that have the effect of discrimination on the basis of disability," *id.* § 12112(b)(3), and "us[es] qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities," *id.* § 12112(b)(6). For these reasons, Union Pacific has violated the ADA in every instance where it refused to certify (or decertified) as a conductor or engineer, removed from service, or terminated any employee, including Waldschmidt, who was able to pass the FRA's hearing exam with or without hearing aids.

121.    Union Pacific also failed to accommodate Waldschmidt's disability. Any number of devices would have allowed Waldschmidt to meet both the FRA's and Union Pacific's standards. Union Pacific's reasons for rejecting the device proposed by Waldschmidt were themselves unreasonable. The governing regulations do not require that hearing-protection devices have a noise-reduction rating. Nor is there any valid reason to prohibit custom-made earplugs. Union Pacific also failed to engage in the interactive process. Throughout the process, Union Pacific sat on its hands and rejected Waldschmidt's proposal for hyper-technical and legally unsupported reasons. Union Pacific's bad faith caused the breakdown in the process and ultimately precluded the identification of a workable device.

122.    Because Union Pacific violated 42 U.S.C. § 12112, Waldschmidt has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Waldschmidt is also entitled to attorneys' fees and costs incurred in connection with these claims.

123.    Union Pacific committed the above-alleged facts with reckless disregard or deliberate disregard for Waldschmidt's rights and safety. As a result, Waldschmidt is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.    Waldschmidt requests that the Court find Union Pacific acted in direct violation of the ADA;

B.      Certify a class of similarly situated employees, appoint Waldschmidt as the class representative, and appoint Waldschmidt's attorneys as class counsel;

C.      Waldschmidt further requests that the Court order Union Pacific to:

        • reinstate him and enter an injunction prohibiting Union Pacific from enforcing its discriminatory policies;

        • pay to him an award of compensatory damages, including backpay and front pay, arising from loss of income and benefits in an amount to be determined by the trier of fact;

        • pay to him an award for garden-variety emotional distress in an amount in excess of $75,000.00;

        • pay to him an award for costs (including litigation and expert costs), disbursements, and attorneys' fees; and

        • pay to him an award for $300,000 for punitive damages for each violation of the ADA.

D.      Waldschmidt further requests that the Court order judgment against Union Pacific for all other relief available under the ADA and such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  December 28, 2020                    /s/ Nicholas D. Thompson
                                            Nicholas D. Thompson (WI#1078903)
                                            nthompson@moodyrrlaw.com
                                            THE MOODY LAW FIRM, INC.
                                            500 Crawford St., Suite 200
                                            Portsmouth, VA 23704
                                            Telephone: (757) 393-4093
                                            Fax: (757) 397-7257

                                            Adam W. Hansen
                                            adam@apollo-law.com
                                            APOLLO LAW LLC
                                            333 Washington Avenue North
                                            Suite 300
                                            Minneapolis, MN 55401
                                            Telephone: (612) 927-2969